UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE SEARS HOLDINGS CORPORATION SECURITIES LITIGATION

No. 06 Civ. 4053-JES

**LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MEMORANDUM IN FURTHER SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT**

Jay W. Eisenhofer (JE-5593)
Geoffrey C. Jarvis (GJ-7040)
GRANT & EISENHOFER P.A.
485 Lexington Avenue, 29th Floor
New York, NY 10017
Telephone: (646) 722-8500
Fax: (646) 722-8501

Samuel H. Rudman (SR-7957)
David A. Rosenfeld (DR-7564)
COUGHLIN STOIA GELLER RUDMAN & ROBBINS LLP
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: (631) 367-7100
Fax: (631) 367-1173

Mark C. Gardy (MG-0338)
James S. Notis (JN-4189)
GARDY & NOTIS, LLP
440 Sylvan Avenue, Suite 110
Englewood Cliffs, NJ 07632
Telephone: (201) 567-7377
Fax: (201) 567-7337

*Co-lead Counsel for Lead Plaintiffs and the Class*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................... ii

INTRODUCTION ..................................................... 1

FACTUAL ALLEGATIONS ..................................................... 3

A. THE COMPLAINT PLEADS ACTUAL DAMAGES IN CONNECTION WITH THE SALE OF SECURITIES BEFORE THE TRUTH ABOUT KMART'S REAL ESTATE WAS REVEALED ..................................................... 3

B. AFTER EMERGING FROM BANKRUPTCY, KMART HAD A DUTY TO DISCLOSE THE FAIR MARKET VALUE OF ITS ASSETS, BUT FAILED TO DO SO, FALSELY REPORTING THAT ITS PPE WAS ONLY $10 MILLION ..................................................... 4

ARGUMENT ..................................................... 5

A. THE COMPLAINT PROPERLY PLEADS ACTUAL ECONOMIC LOSS ..................................................... 5

B. DEFENDANTS' "FRAUD DISCOUNT" ARGUMENT LACKS MERIT AS PLAINTIFFS SUFFERED COGNIZABLE DAMAGES ..................................................... 10

C. DEFENDANTS' ARGUMENT THAT PLAINTIFFS' COMPLAINT IS AN IMPERMISSIBLE "COLLATERAL ATTACK" ON THE BANKRUPTCY COURT'S CONFIRMATION IS UNTIMELY AND LACKS MERIT ..................................................... 12

CONCLUSION ..................................................... 14

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Affiliated Ute Citizens v. U.S.*,
406 U.S. 128 (1972) .......... 6, 8

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988) .......... 6, 8

*Blackie v. Barrack*,
524 F.2d 891 (9th Cir. 1975) .......... 11

*Carlisle Ventures, Inc. v. Banco Espanol de Credito, S.A.*,
176 F.3d 601 (2d Cir. 1999) .......... 8

*Catton v. Defense Tech. Sys., Inc.*,
No. 05-6954 (SAS), 2006 WL 27470 (S.D.N.Y. Jan. 3, 2006) .......... 6

*Commercial Union Assurance Co., plc v. Milken*,
17 F.3d 608 (2d Cir. 1994) .......... 9

*In re Credit Suisse First Boston Corp. Sec. Litig.*,
No. 97-4760 (JGK), 1998 WL 734365 (S.D.N.Y. Oct. 20, 1998) .......... 7, 8

*Davis v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
906 F.2d 1206 (8th Cir. 1990) .......... 7, 8

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005) .......... 9, 10, 12, 13

*In re Emerald Acquisition Corp.*,
170 B.R. 632 (Bankr. N.D. Ill. 1994) .......... 13

*Emergent Cap. Inv. Mgmt., LLC v. Stonepath Group, Inc.*,
343 F. 3d 189 (2d Cir. 2003) .......... 10

*In re Estee Lauder Cos. Sec. Litig.*,
No. 06-2505, 2007 WL 1522620 (S.D.N.Y. May 21, 2007) .......... 9

*In re Gilat Satellite Networks, Ltd.*,
No. 02-1510 (CPS), 2007 WL 2743675 (E.D.N.Y. Sept. 18, 2007) .......... 6

*Gurary v. Winehouse*,
190 F.3d 37 (2d Cir. 1999) .......... 10

*In re Initial Pub. Offering Sec. Litig.*,
297 F. Supp. 2d 668 (S.D.N.Y. 2003) .......... 5, 8, 12

*Lentell v. Merrill Lynch & Co.*,
396 F.3d 161 (2d Cir. 2005) .......... 10, 12

*Levie v. Sears, Roebuck & Co.*,
496 F. Supp. 2d 944 (N.D. Ill. 2007) .......... 7

*LNC Invs., Inc. v. First Fidelity Bank*,
No. 92-7584, 1997 WL 528283 (S.D.N.Y. Aug. 27, 1997) .......... 10

*Mitchell v. Texas Gulf Sulphur Co.*,
446 F.2d 90 (10th Cir. 1971) .......... 8

*In re NYSE Specialists Sec. Litig.*,
405 F. Supp. 2d 281 (S.D.N.Y. 2005) *aff'd in part, vacated in part and remanded,* 503 F.3d 89 (2d Cir. 2007), *cert. denied*, 128 S. Ct. 1707 (2008) .......... 9

*Rowe v. Maremont Corp.*,
850 F.2d 1226 (7th Cir. 1988) .......... 8, 11

*Stetner v. Medquist Inc.,*
No. 04-5487, 2006 WL 2827740 (D.N.J. Sept. 29, 2006) .......... 9

*Stoll v. Gottlieb*,
305 U.S. 165 (1938) .......... 13

*Sure-Snap Corp. v. State St. Bank & Trust Co.*,
948 F.2d 869 (2d Cir. 1991) .......... 13

*Wilson v. Great Am. Indus, Inc.*
855 F.2d 987 (2d Cir. 1988) .......... 6

**STATUTES & RULES**

Exchange Act § 28(a), 15 U.S.C. § 78bb(a) .......... 8, 10

Fed. R. Civ. P. 8(a) .......... 10

Fed. R. Civ. P. 12(b) .......... 12

**INTRODUCTION**

Lead Plaintiffs, the Public Employees' Retirement System of Mississippi, Plumbers and Pipefitters National Pension Fund, Fred P. Campo and Leonard Cope (collectively "Plaintiffs") hereby respond to Defendants' Memorandum of Law in Further Support of Defendants' Motion to Dismiss, dated May 30, 2008, filed by Defendants Sears Holdings Corporation (as successor in interest to Kmart Holding Corporation, hereinafter "Kmart" or the "Company"), Edward S. Lampert ("Lampert") and Julian Day ("Day") (collectively "Defendants").

Plaintiffs brought this action on behalf of themselves and a class of shareholders (the "Class") who ***sold*** shares of Kmart stock between May 6, 2003 and September 29, 2004 (the "Class Period"), to recover damages sustained in connection with the Defendants' fraudulent material misrepresentations and omissions regarding the value of real estate held by Kmart. Plaintiffs alleged that Defendants made false and misleading statements in a number of public documents filed with the Securities and Exchange Commission ("SEC") after Kmart emerged from bankruptcy on May 6, 2003. *See infra* Background § B. In sum, Defendants represented that Kmart's entire plant, property and equipment ("PPE") was worth only $10 million, when in reality Kmart's real estate holdings were worth tens of billions of dollars. *Id*. As a result of these misrepresentations, Kmart's stock price was substantially undervalued, allowing Lampert to purchase shares at reduced prices and causing Plaintiffs and the Class to sell their shares for much less than those shares would have been worth had the truth been disclosed. When the truth was finally disclosed through a series of real estate transactions, Kmart stock jumped more than 61% in value from $54.86 to $88.06 per share.

Defendants, in their Memorandum of Law in Further Support of Defendants' Motion to Dismiss, dated May 30, 2008 ("Def. Mem."), having already exhausted and lost their arguments that the Consolidated Class Action Complaint (the "Complaint") does not adequately state a claim, *see* Transcript of Hearing on Motion to Dismiss, dated April 15, 2008 ("Tr."), at p. 61 (denying Defendants' motion to dismiss), now seek to reprise arguments on damages that they could have raised in their initial motion. Each of their arguments must fail. First, Defendants' primary argument, that Plaintiffs must show an out-

of pocket loss, which Defendants seek to define as selling shares for less than they were purchased (*see* Def. Mem. at 7-10), is completely contrary to established law and their own brief. Defendants, in their recent brief, specifically recognize that economic loss can be pled through the existence of a "fraud discount," which establishes an economic loss irrespective of the actual trading price of the stock. *See* Def. Mem. at 11-12. *See also* Argument § A.

Second, Defendants' argument that, to the extent there was "artificial deflation" in the price of Kmart stock, all shares were acquired and sold at the same level of "deflation" – thus allegedly negating damage – is factually inaccurate. Plaintiffs' Class is composed of (1) persons/entities who acquired shares in the bankruptcy in return for debts owed to them by Kmart; and (2) persons/entities who acquired shares on the open market after Kmart emerged from bankruptcy. As to the first group, they acquired a certain number of shares based upon their bankruptcy claim and, after the emergence from bankruptcy sold those shares at prices that were artificially deflated through Kmart's false and misleading statements regarding the value of Kmart real estate. Had the truth been told, they would have received a higher price for their shares when they were sold. This is clear and unequivocal economic damage to them. As to the second group, given that there were multiple false statements throughout the Class Period, *infra* Background § B, Plaintiffs will, at the appropriate time, put forth expert testimony showing that deflation increased during the class period in response to Defendants' repeated falsehoods. Thus, purchasers early in the Class Period purchased at less deflation than the level at which they later sold. Their damages are the difference between the two levels of deflation. *See infra* Argument § B. This is a factual issue that is more appropriately addressed at summary judgment.

Finally, Defendants' argument based upon the alleged holding of the bankruptcy court is outside the scope of this brief and, in any event, is irrelevant since Plaintiffs' claims are premised upon false statements in Kmart's post-bankruptcy public filings and not upon any statement in the bankruptcy proceeding. *See infra* Argument § C. Accordingly, Defendants' motion to dismiss should be denied and this case should proceed to full merits discovery.

## FACTUAL ALLEGATIONS

### A. THE COMPLAINT PLEADS ACTUAL DAMAGES IN CONNECTION WITH THE SALE OF SECURITIES BEFORE THE TRUTH ABOUT KMART'S REAL ESTATE WAS REVEALED

As detailed in the Complaint, Defendants engaged in a scheme to deceive the market through a course of conduct that undervalued the prices of Kmart's securities and operated as a fraud or deceit on Class Period sellers of Kmart's securities by issuing materially false and misleading statements that misrepresented the true value of Kmart's real estate and other assets. As Kmart disclosed that its real estate was, in fact, more valuable than previously represented, the prices of Kmart's securities increased precipitously. The Complaint specifically alleges: "As a result of their sales of Kmart's securities during the Class Period at prices that did not reflect the true value of the Company's securities, Lead Plaintiffs and the other Class members have suffered ***economic loss, i.e., damages under the federal securities laws***." ¶ 176 (emphasis added).

The Complaint alleges that by misrepresenting the value of Kmart's real estate, and by failing to reveal the leasehold value of Kmart's stores, Defendants presented a misleading picture of Kmart's true worth. As alleged in this Complaint, the prices of Kmart's securities were artificially deflated by the false and misleading statements Defendants made during the Class Period. But for the false and misleading information about the value of Kmart's real estate, the Company's securities would not have traded at the depressed levels that they did during the Class Period. As a direct result of Defendants' disclosures on June 4, 2004, June 30, 2004 and September 29, 2004 – in which Defendants disclosed details about the true value of Kmart's assets – Kmart's common stock price increased dramatically:

> On June 4, 2004, Kmart announced that it would sell up to 24 stores to The Home Depot Inc. ("Home Depot") for up to $365 million, or roughly $15 million per store. On this news, Kmart's stock price jumped $7.67 per share to $62.53 per share, nearly a 14% increase. ¶¶ 9, 178.
>
> On June 30, 2004, Kmart announced the sale of 54 stores at a maximum purchase price of $621 million in cash to Sears, Roebuck & Co. ("Sears, Roebuck"), with each store fetching an average price of $11.5 million. Following this second announcement, Kmart's common stock increased $3.58 per share, or approximately 5.25%, and closed at $71.80 per share. ¶¶ 9, 179.

> On September 29, 2004, Kmart announced that it had finalized the transaction with Sears, Roebuck, selling 50 stores for an aggregate purchase price of approximately $575 million in cash, or an average price of $11.5 million. As a result, Kmart's common stock increased $2.21 per share, or approximately 2.57%, and closed at $88.06 per share.

These three increases reflect that Kmart's stock was undervalued by at least $33.20 per share as a result of its misrepresentations regarding its real estate. ¶¶ 10, 180.[1]

### B. AFTER EMERGING FROM BANKRUPTCY, KMART HAD A DUTY TO DISCLOSE THE FAIR MARKET VALUE OF ITS ASSETS, BUT FAILED TO DO SO, FALSELY REPORTING THAT ITS PPE WAS ONLY $10 MILLION

Kmart had a post-bankruptcy duty to value its real estate at fair market value, but instead repeated its false statements that all of its PPE was only worth $10 million. In the Complaint, Plaintiffs allege a number of fraudulent misstatements in Kmart's public filings, all of which occurred after the confirmation plan and Kmart's emergence from bankruptcy, in which Defendants falsely claim that Kmart's real estate assets are being valued at fair market value:

- Kmart's Form 10-Q for the First Quarter of 2003, filed on June 16, 2003, stated that Kmart's PPE was valued at *$10 million* (¶ 97) and that, *inter alia*, "In accordance with Fresh-Start accounting, all assets and liabilities were recorded at their respective fair market values. Such fair values represented our best estimates based on independent appraisals and valuations." ¶ 100.

- Kmart's Form 10-Q for the Second Quarter of 2003, filed on August 29, 2003, stated that Kmart's PPE was valued at *$43 million* (¶ 105) and that, *inter alia*, "In accordance with Fresh-Start accounting, all assets and liabilities were recorded at their respective fair market values. Such fair values represented our best estimates based on independent appraisals and valuations." ¶ 106.

- Kmart's Form 10-Q for the Third Quarter of 2003, filed on December 5, 2003, stated that Kmart's PPE was valued at *$115 million* (¶ 110) and that, *inter alia*, "In accordance with Fresh-Start accounting, all assets and liabilities were recorded at their respective fair market values. Such fair values represented our best estimates based on independent appraisals and valuations." ¶ 111.

- Kmart's 2004 Form 10-K, filed on March 18, 2004, stated that Kmart's PPE was valued at *$153 million* (¶ 117) and that, *inter alia*, "In accordance with fresh-Start accounting, all assets and liabilities were recorded at their respective fair market values upon emergence from Chapter 11. Such fair values represented our best estimates based on independent appraisals and valuations." ¶ 119, 121.

---

[1] "By November 2004, at least one real estate analyst with Deutsche Bank, Louis Taylor, had calculated that Kmart's real estate could be worth as much as $153 a share or ***$15.23 billion*** in value for Kmart's real estate." ¶ 78 (emphasis added). "Further, projecting the value of sold stores in Kmart's entire real estate portfolio indicates that Kmart's real estate may have been worth in excess of ***$18 billion***." ¶ 11 (emphasis added).

- Kmart's Form 10-Q for the First Quarter of 2004, filed on May 17, 2004, stated that Kmart's PPE was valued at *$190 million* (¶ 126) and that, *inter alia*, "In accordance with Fresh-Start accounting, all assets and liabilities were recorded at their respective fair market values. Such fair values represented our best estimates based on independent appraisals and valuations." ¶ 129.

Thus, after emerging from bankruptcy, this representation created a duty to accurately disclose the fair market value of Kmart's real-estate holdings. Kmart failed to do so, rendering its statements false and misleading.

## ARGUMENT

### A. THE COMPLAINT PROPERLY PLEADS ACTUAL ECONOMIC LOSS

Defendants argue that Plaintiffs allege no economic loss, essentially claiming that Plaintiffs must allege that they sold Kmart shares at a price less than Plaintiffs paid for such shares. Def. Mem. at 7-10. In support of their argument, Defendants cite cases that they incorrectly assert stand for the proposition that a plaintiff "cannot state a claim for securities fraud by speculatively positing that in the absence of fraud, he would have made an even greater profit on the sale of securities at issue." Def. Mem. at 7-8. Defendants distort and misstate the law.

First, Defendants' own brief acknowledges that it is permissible in cases brought under Rule 10b-5 to premise damages on the difference between the level of inflation (or deflation) at purchase and the level at the sale of the security. Def. Mem. at 11-12. As Defendant themselves make clear, "a purchaser alleging the existence of a 'fraud premium' can state a claim for securities fraud only if he holds his shares until the 'fraud premium' is no longer present." *Id*. at 11. Thus, Defendants admit that changes in the level of the fraud premium – without reference to whether there was a trading profit or loss – determines whether a claim can be stated.

Second, the law is clear that the proper method for calculating damages in a Rule 10b-5 case is the difference between the artificial inflation (or deflation) at the time of purchase and the artificial inflation (or deflation) at the time of sale. *See, e.g., In re Initial Pub. Offering Sec. Litig.*, 297 F. Supp. 2d 668, 673 (S.D.N.Y. 2003) (Scheindlin, J) ("inflated stock prices can lead to a loss in one of two ways.

First, there can be an external correction to the market, such as a corrective disclosure. Once the fraud is revealed, it no longer taints the stock price and the artificial inflation disappears. The result is a sale at true value, causing a loss based on the inflated price at the time of purchase."); *Catton v. Defense Tech. Sys., Inc.*, No. 05-6954 (SAS), 2006 WL 27470, at *5 (S.D.N.Y. Jan. 3, 2006) (to establish causation "a plaintiff may identify particular 'disclosing event[s]' that reveal the false information, and tie dissipation of artificial price inflation to those events") (internal citation omitted).[2] This occurs regardless of whether the plaintiff had a paper trade or loss on the sale of the security.

Third, the law is clear that damages in seller cases do not require that a seller have purchased shares at a higher price than he/she ultimately received for them. In *Affiliated Ute Citizens v. U.S.*, 406 U.S. 128 (1972), for example, the Supreme Court held defendants violated Rule 10b-5 by devising a plan and inducing plaintiff shareholders to dispose of their shares without disclosing to them material facts that reasonably could have been expected to influence their decisions to ***sell***. The Court held that the correct measure of damages in a ***seller*** case is the difference between the fair value of what the seller received for the shares and the fair value of what he would have received had there been no fraudulent conduct. *Id.* at 155. *See also Basic Inc. v. Levinson,* 485 U.S. 224, 228 (1988) "[plaintiffs] alleged that they were ***injured by selling Basic shares at artificially depressed prices in a market affected by [defendants'] misleading statements and in reliance thereon"*** and the Supreme Court upheld the claim, reversing the decision of the Court of Appeals that the alleged misleading statements were immaterial) (emphasis added).[3]

---

[2] *See also In re Gilat Satellite Networks, Ltd.,* No. 02-1510 (CPS), 2007 WL 2743675, at *5 (E.D.N.Y. Sept. 18, 2007) (in case approving plan of allocation, court approved method for calculating damages, stating that "at certain times during the Class Period, Gilat made disclosures which partially revealed the alleged fraud and caused the stock price to fall, thereby reducing the amount of artificial inflation caused by earlier allegedly false and misleading statements. Accordingly, the Plan of Allocation identifies five different time periods and allocates damages on the basis of the amount of artificial inflation remaining in the stock price during each of these periods. Each Authorized Claimant shall be allocated a pro rata share of the Net Settlement Fund based on his, her or its Recognized Claim as compared to the total Recognized Claims of all Authorized Claimants") (internal citation omitted).

[3] *See also Wilson v. Great Am. Indus., Inc*., 855 F.2d 987, 996 (2d Cir. 1988) (holding fraudulent nondisclosure permitted the defendants to acquire shares at a price that did not reflect future profitability as projected by the defendants with their superior knowledge, and that ***plaintiffs suffered damages because they "would have profited from a higher tender price had full disclosure been made"***) (emphasis added).

Similarly, in *In re Credit Suisse First Boston Corp. Sec. Litig.*, No. 97-4760 (JGK), 1998 WL 734365, at *12 (S.D.N.Y. Oct. 20, 1998), the Complaint alleged that the defendants engaged in a scheme to profit on CSFBC's "short" positions in the common stock of Data Dimensions and Viasoft by preparing a misleading analyst report called the Trading Notes. The plaintiffs in *In re Credit Suisse* were members of a proposed class of individuals who ***sold*** Data Dimensions or Viasoft stock (or were required to and did purchase such stock pursuant to previously sold put contracts), ***at artificially depressed prices***. *Id*. The Court sustained the complaint, finding that:

> The plaintiffs claim that plaintiff DeLeo ***sold his Data Dimensions stock for less money than it was worth because the defendants' fraud artificially depressed the price at which the stock was trading*** . . . . At this stage of the litigation, the plaintiffs have sufficiently pleaded that they were damaged by the defendants' alleged fraud. Thus the defendants' motion to dismiss on this ground is denied.

*Id*. (emphasis added).

Most recently, in a case involving the same defendant and counsel as the instant case, *Levie v. Sears, Roebuck & Co*., 496 F. Supp. 2d 944 (N.D. Ill. 2007), defendants opposed class certification of a class of sellers of Sears common stock who sold *after* Sears and defendant Lampert were in merger negotiations with Kmart but *before* the Kmart/Sears merger was disclosed (at which point the stock increased by 17%). Defendants had argued that a purchaser who sold before the corrective disclosure bought and sold at a price that was ***"as 'artificially deflated' when he bought as it was when he sold"*** and therefore suffered no loss, the same argument Defendants make here. The Court disagreed:

> According to plaintiffs, in a purchaser class action "where an investor who purchases during the class period sells before the fraud is revealed, that investor is presumed to recover the artificial inflation paid on the purchase at the time of the intra-class period sale, and any decline in value is assumed to be attributable to market price movements unrelated to the alleged fraud." Therefore, that investor does not suffer a loss caused by the alleged misrepresentation or omission. No such rationale applies to a seller class, argue plaintiffs, because ***any investor who sold during the class period before the revelation of the merger sold at an artificially low price***. ***The court agrees with plaintiffs***.

*Id*. at 948 (emphasis added).

Finally, flatly rejecting Defendants' assertion that the existence of a "profit" somehow eliminates any damages, the court in *Davis v. Merrill Lynch, Pierce, Fenner & Smith, Inc*., 906 F.2d 1206 (8th Cir.

1990) specifically held that a net profit is not a bar to recovery for damages under § 10(b). In that case, the plaintiffs' stock account made a net profit. Nevertheless, the Court held that, due to defendants' wrongful churning, "if an account earned $50,000 but would have earned $100,000, if it was not churned, the customer has sustained actual damages in the amount of $50,000 . . . ." *Id*. at 1219.

Thus, the law is clear that in a seller action, the economic loss, or "out-of-pocket" loss, the "actual damage" under the federal statute, is determined by the difference between the selling price of the stock and the actual value of the stock when sold. The idea that Plaintiffs' Section 10(b) claim is somehow barred because of gain between the price of the shares when purchased versus the sale price has no legal support and completely ignores the vast case law relating to a seller's claim for damages in a securities fraud case where the wrong was defendants' deflation of the share sale price at the time of plaintiffs' sale. *See, e.g., Affiliated Ute,* 406 U.S. at 125; *In re Credit Suisse First Boston Corp. Sec. Litig.*, 1998 WL 734365, at *12; *Rowe v. Maremont Corp.*, 850 F.2d 1226 (7th Cir. 1988); *Mitchell v. Texas Gulf Sulphur Co.*, 446 F. 2d 90 (10th Cir. 1971).

The Complaint sufficiently pleads an economic loss by alleging that Plaintiffs ***sold*** shares at artificially deflated prices during the Class Period and by alleging the elimination of the fraud discount in the price of Kmart securities as the truth began to emerge and was finally revealed. *See* ¶¶ 9-11, 13-15, 176-81. The Complaint alleges that Defendants made numerous materially false and misleading negative statements regarding the fair market value of Kmart's real estate assets to the public during the Class Period despite knowing or recklessly disregarding material non-public facts that seriously undermined those statements. *See* ¶¶ 110-29. The Complaint further alleges that once the true value of these leases was disclosed, there was a rise in the Company's share price. *See* ¶¶ 177-81. This is sufficient to establish the existence of economic loss. Exchange Act § 28(a), 15 U.S.C. § 78bb(a).

The cases relied upon by Defendants do not contradict this theory of damages as they are completely inapposite. *Carlisle Ventures, Inc. v. Banco Espanol de Credito, S.A.*, 176 F.3d 601, 605 (2d Cir. 1999) is the case most frequently cited in Defendants' Memorandum. *See* Def. Mem. at 7, 8, 9, 10. But *Carlisle Ventures* is totally inapposite. *Carlisle Ventures* was a contract action, not an action for

securities fraud, and the decision provides a measure for contract damages, not damages for securities fraud. The decision was also based on the application of Spanish law. Thus, it wholly lacks relevance in a Rule 10b-5 action.

Another case heavily cited by Defendants, *Commercial Union Assurance Co., plc v. Milken*, 17 F.3d 608, 609 (2d Cir. 1994), *see* Def. Mem. at 7, 9, 10, also is inapposite as it stands simply for the proposition that plaintiffs may lack recoverable damages where plaintiffs have been fully repaid through prior settlement awards.[4] In *Commercial Union*, plaintiffs were fully compensated in a separate proceeding and thus were found not to have damages.[5]

Finally, Defendants rely on a 3-page order in *In re Estee Lauder Cos. Sec. Litig.*, No. 06-2505, 2007 WL 1522620, at *1 (S.D.N.Y. May 21, 2007) for the proposition that in a purchaser case, a sale at a profit is equal to a plaintiff suffering "no cognizable damages under Rule 10b-5." Def. Mem. at 8. But *Estee Lauder* which related to claims of "channel stuffing" simply dismissed the Complaint because it failed to provide the defendants with notice of what the "causal connection might be" between the economic loss and the misrepresentation (something clearly alleged in the instant Complaint) at the same time that *it granted the plaintiff an opportunity to replead*. *Id*. Moreover, the idea that in a ***purchaser*** case the *only* to way to plead loss causation is to plead a stock decline has been rejected. *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346-47 (2005) (negative affect on the stock price caused by disclosure sufficient to sustain a 10(b) action) (dicta); *Steiner v. MedQuist Inc.,* No. 04-5487, 2006 WL 2827740, at *19 (D.N.J. Sept. 29, 2006) ("a firm that lies about some assets cannot defeat liability by showing that other parts of its business did better than expected, counterbalancing the loss.")

---

[4] *But see In re NYSE Specialists Sec. Litig.*, 405 F. Supp. 2d 281 (S.D.N.Y. 2005), *aff'd in part, vacated in part and remanded,* 503 F.3d 89 (2d Cir. 2007), *cert. denied*, 128 S. Ct. 1707 (2008) (Exchange Act's single recovery provision did not require dismissal of investors' securities fraud action against national securities exchange specialists, although specialists had entered into settlements with Securities and Exchange Commission (SEC) following SEC's investigation of the alleged improper conduct; parties disputed whether sums paid by the specialists pursuant to the settlements were equivalent to full value of investors' losses, and structure of SEC-administered distribution funds evidenced substantial degree of uncertainty concerning SEC's loss calculations).

[5] Plaintiffs sought a trebling of their invested capital in Boesky partnership interests ($10.5 million) none of which had been returned at the time they initiated suit. After suit, the liquidation trustee of the Boesky partnership, using

Accordingly, Defendants' cases do not support their argument because they have no application to the instant action, where Plaintiffs suffered losses in the sale of their Kmart securities, and where no prior settlement has made Plaintiffs whole to the extent that they can no longer prove damages. There is no dispute that Section 10(b) requires "actual damages," *see* Exchange Act § 28(a), 15 U.S.C. § 78bb(a) (limiting damages to the amount of a plaintiff's "actual damages on account of the act complained of").[6] But actual damages are exactly what the Complaint alleges and thus Defendants' argument must be rejected.

**B. DEFENDANTS' "FRAUD DISCOUNT" ARGUMENT LACKS MERIT AS PLAINTIFFS SUFFERED COGNIZABLE DAMAGES**

Defendants argue that any alleged detriment suffered by Plaintiffs when they sold Kmart shares would exactly offset the benefit realized by Plaintiffs from the "fraud discount" when they acquired Kmart shares. Def. Mem. at 11. Defendants ignore the actual damages theories in the Complaint and seek to impose a summary judgment standard by substituting their facts for those that are pled.

The Second Circuit has stated that loss causation "is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005) (quoting *Emergent Cap. Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 197 (2d Cir. 2003)). In *Dura*, 544 U.S. at 346, the Supreme Court emphasized that Fed. R. Civ. P. 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief" and that "neither the Rules nor the securities statutes impose any special further requirement in respect to the pleading of proximate causation or economic loss." *Id*. In this case, as explained above, there are two groups of Plaintiffs who suffered damages: those who acquired their shares during the bankruptcy and those who acquired their shares after the bankruptcy.

---

funds paid by defendants in settlement, paid plaintiffs 114.6 percent of their initial capital investment (and plaintiffs still owned their partnership interests). *Commercial Union*, 17 F.3d at 610-12.

[6] *See also* the cases cited by Defendants at Def. Mem. p. 7 (*Gurary v. Winehouse*, 190 F.3d 37, 46 (2d Cir. 1999) ("common sense application of Section 28(a) of the Exchange Act" requires actual damages); *LNC Invs., Inc. v. First Fidelity Bank*, No. 92-7584, 1997 WL 528283, at *34 (S.D.N.Y. Aug. 27, 1997) (explaining that "[u]nder the Securities Exchange Act, actual damages are measured by out-of-pocket losses).

The former creditors of Kmart whose claims were not paid received shares in the reorganized company based upon the amount of the claims they had in bankruptcy. As explained in the Complaint (¶ 53):

> Kmart's unsecured creditors, including holders of notes, vendors and lessors with rejected leases, were converted into common stock of the new holding company. Noteholders had $2.27 billion in claims and received, as a group, 25 million shares of stock in Kmart ("new Kmart stock"), while holders of trade vendor and lease rejection claims had $4.3 billion in aggregate claims and, as a group, received 31.9 million shares of new Kmart stock. Kmart's pre-petition existing common stock was reduced to zero and former common stock holders were entitled only to recoveries obtained by Kmart's litigation trust.

Accordingly, members of the Class who received their stock in bankruptcy received a proportionate share of the number of shares allocated to their group of creditors based upon pre-existing claims against Kmart. Those persons who received shares in the bankruptcy and sold shares prior to the announcements setting forth the true value of Kmart's real estate were damaged by the amount of deflation in the stock. For example, had Kmart put forth the true value of the real estate in their initial form 10-Q, the value of Kmart's stock would have increased dramatically and these selling shareholders would have received much more for their stock. *Maremont Corp.*, 850 F.2d at 1240. Instead, Kmart lied about the value of the real estate, creating fraudulent deflation in the value of the stock and harming shareholders.

Those persons/entities who purchased stock after Kmart emerged from bankruptcy also have claims. During the Class Period, as noted above (*see supra* Background § B), Kmart made a number of false statements in forms 10-Q and 10-K and elsewhere regarding the value of its real estate. Plaintiffs assert, and will seek to prove through expert testimony, that those repeated statements had the effect of increasing the amount of fraudulent deflation, such that a person/entity who purchased early in the class period and sold later in the period has cognizable damages because the amount of deflation increased.[7]

---

[7] In any event, the ***amount*** of "actual damages" is a matter for the fact finder and not likely not be determined until expert testimony. *See Blackie v. Barrack*, 524 F.2d 891, 909 n. 25 (9th Cir. 1975). *See also Maremont Corp.*, 850 F.2d at 1240-43. In *Maremont Corp.* after a bench trial below, the Court of Appeals held defrauded sellers of Pemcor shares were entitled to damages based on the difference between what they received and what they would have received absent the fraud (defendant's omissions and false representations that it would not be making a tender

*See In re Initial Pub. Offering Sec. Litig.*, 297 F. Supp. 2d at 673. This theory of damages is more than sufficient to meet *Dura*'s requirement of "a short and plain statement of the claim showing that the pleader is entitled to relief…." *Dura*, 544 U.S. at 346.[8]

Because the Complaint here alleges both artificial deflation of the market prices of Kmart securities caused by Defendants' false and misleading statements and a subsequent elimination of that deflation as a result of the falsity of those misrepresentations being revealed to the public, the pleading standard for loss causation in *Dura* and in *Lentell* is satisfied here. ¶¶ 9-11, 13-15, 176-81.

### C. DEFENDANTS' ARGUMENT THAT PLAINTIFFS' COMPLAINT IS AN IMPERMISSIBLE "COLLATERAL ATTACK" ON THE BANKRUPTCY COURT'S CONFIRMATION IS UNTIMELY AND LACKS MERIT

Defendants argue that the Complaint is an impermissible "collateral attack" on the bankruptcy court's confirmation order, dated April 23, 2003. Def. Mem. at 13-15. Defendants are wrong both procedurally and as a matter of substantive law.

As a matter of procedure, Defendants made their Fed. R. Civ. P. 12(b)(6) motion to dismiss on May 11, 2007, asserting two basis for their argument that Plaintiffs' Complaint failed to state a claim under §§ 10(b) and 20(a). First, that the Complaint failed to allege scienter and second, that the Complaint failed to allege a material misstatement or omission. The Court denied Defendants' motion on April 15, 2008. Tr. at 61. At a subsequent hearing on April 30, 2008, Defendants requested leave to file further papers on another element of Plaintiffs' 10(b) claim – that of damages, and specifically, damages as elucidated by the Supreme Court's ruling in *Dura*. Tr. of April 30, 2008 Hearing at 18-21. In allowing supplemental briefing on damages, the Court noted that "I don't think I've ever done it [dismissed a case

---

offer for Pemcor stock). The Court of Appeals upheld a damage award that represented the difference between sellers $13 per share price received and the actual value of the shares after the announcement of the tender offer ($16.3 per share) (which also approximated a 25 percent premium for control stock (equal to $3.25 per share)).

[8] The transcript of the oral argument before the Supreme Court illustrates that in no way did the Supreme Court's decision in *Dura* preclude a seller from alleging actual damages merely because the sellers' damages resulted in a sale at a deflated stock price. *See, e.g.*, *Dura* Oral Arg. Tr. at 10–14 (discussing how a seller might suffer damages under 10(b) even where shares in mining concern rise from $60 to $200 on unexpected news of platinum being found, where company claimed it found gold but gold never existed and had gold existed, shares would have sold for $250. Justice Breyer stating that in such an instance plaintiff suffered a loss of $250 versus $200 or $50 even where stock goes up, because "the stock goes up but not as much as it would have." *Id*. at 11.)

on damages grounds]. And the Second Circuit is replete with cases where causation is a jury question, you know"). Tr. of April 30, 2008 Hearing at 21.

Having made their 12(b)(6) motion to dismiss for failure to state a claim, the Defendants are not at liberty to raise new arguments (absent permission by the Court). The Court permitted further briefing on the issue of damages, loss causation and *Dura*, but there was no discussion of this "collateral estoppel" issue and for that reason Section C of the Defendants' Memorandum in Further Support should be stricken.

In any event, the Defendants' "collateral estoppel" argument is completely without merit. First, Defendants' contention that Plaintiffs seek to challenge any orders of the Bankruptcy Court is simply untrue. Plaintiffs' claims are based on misrepresentations and omissions in Kmart's public filings issued after Kmart emerged from bankruptcy on May 1, 2003. *See supra* Background § B. There is not a single statement in the Complaint from the bankruptcy proceeding that Plaintiffs have alleged is an actionable false statement. *See* ¶¶ 88-132.

Second, preclusion of a "collateral attack" on a bankruptcy court confirmation is a doctrine of "*res judicata*." This is a fact that makes the cases supposedly supporting Defendants' argument completely distinguishable.[9] Thus, Defendants' collateral attack argument should be rejected in its entirety.

---

[9] *See, e.g., Stoll v. Gottlieb*, 305 U.S. 165, 170-71 (1938) (respondent Gottlieb had petitioned in the bankruptcy proceeding to vacate the order confirming the plan of reorganization which was denied; respondent's parallel action in Municipal Court was held by the Supreme Court to be barred by "res judicata"); *Sure-Snap Corp. v. State St. Bank & Trust Co.*, 948 F.2d 869, 873 (2d Cir. 1991) (petitioner-debtor in bankruptcy, Sure-Snap, had defaulted on loans to banks and after confirmation in Vermont bankruptcy court of Sure-Snap's reorganization plan and new payment schedule plan to banks, Sure-Snap brought lender liability claim against banks in district court in Florida; Second Circuit upheld dismissal of Florida action after its transfer to Vermont as barred by "res judicata"); *In re Emerald Acquisition Corp.*, 170 B.R. 632, 644 (Bankr. N.D. Ill. 1994) (fraud claims of plaintiff shareholder were not "core" claims and could proceed against defendants where plaintiff was not a party to the bankruptcy proceeding). Here, the doctrine of res judicata does not apply because Plaintiffs and the Class were not participants in the bankruptcy proceeding.

**CONCLUSION**

For all the aforementioned reasons, Plaintiffs respectfully request the Court not reverse its previous holding that Defendants' motion to dismiss is denied.

Dated: June 30, 2008

Respectfully submitted,

/s/ Geoffrey C. Jarvis
Jay W. Eisenhofer (JE-5593)
Geoffrey C. Jarvis (GJ-7040)
GRANT & EISENHOFER P.A.
485 Lexington Avenue, 29th Floor
New York, NY 10017
Telephone: (646) 722-8500
Fax: (646) 722-8501

Samuel H. Rudman (SR-7957)
David A. Rosenfeld (DR-7564)
COUGHLIN STOIA GELLER RUDMAN & ROBBINS LLP
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: (631) 367-7100
Fax: (631) 367-1173

Mark C. Gardy (MG-0338)
James S. Notis (JN-4189)
GARDY & NOTIS, LLP
440 Sylvan Avenue, Suite 110
Englewood Cliffs, NJ 07632
Telephone: (201) 567-7377
Fax: (201) 567-7337

***Co-lead Counsel for Lead Plaintiffs and the Class***