UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
FRED P. CAMPO, et al.,

                  Plaintiffs,

          -against-                           06 Civ. 4053 (LAK)

SEARS HOLDINGS CORPORATION, et al.,

                  Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OPINION

Appearances:

        Jay W. Eisenhofer, Esq.
        Geoffrey C. Jarvis, Esq.
        GRANT & EISENHOFER P.A.

        Samuel H. Rudman, Esq.
        David A. Rosenfeld, Esq.
        COUGHLIN STOIA GELLER RUDMAN & ROBBINS LLP

        Mark C. Gardy, Esq.
        James S. Notis, Esq.
        GARDY & NOTIS, LLP

        *Attorneys for Plaintiffs*

        Paul Vizcarrondo, Jr., Esq.
        David B. Anders, Esq.
        Emil A. Kleinhaus, Esq.
        Jonathan E. Goldin, Esq.
        WACHTELL, LIPTON, ROSEN & KATZ
        *Attorneys for Defendants*

LEWIS A. KAPLAN, *District Judge.*

Lead plaintiffs, former shareholders of Kmart Holding Corporation ("Kmart"), bring this purported class action against Sears Holdings Corporation ("Sears"), Edward S. Lampert, and Julian Day.  They claim that defendants knowingly made statements that substantially undervalued Kmart's real estate assets during and in the immediate wake of its reorganization in order artificially to suppress the price of the company's stock.  The matter is before the Court on defendants' motion to dismiss the Consolidated Class Action Complaint (the "Complaint") on the ground that it fails to state a legally sufficient claim.  For the reasons set forth below, the motion is granted.

*Facts*

*The Parties*

Kmart, the well known "big box" retailer, filed for Chapter 11 protection on January 22, 2002,[1] and emerged on May 6, 2003.[2]  Under the plan of reorganization (the "Plan"), all of the outstanding shares of its common stock were cancelled, and new shares in the reorganized company were issued to various creditors of the bankrupt estate.[3]

Plaintiffs claim to represent a class of persons who sold Kmart shares in the period May 6, 2003, through September 29, 2004 (the "Class Period").  All class members therefore necessarily came to own their Kmart shares either through its distribution to them as creditors

---

[1]       Complaint ("Cpt.") ¶ 3.

[2]       *See id.* ¶ 17.

[3]       *See id.* ¶ 53.

2

of the bankrupt estate pursuant to the Plan or by some post-reorganization transaction.

The defendants in this case are (1) Sears, which in 2005 allegedly succeeded to Kmart's liabilities in consequence of a transaction in which Kmart acquired Sears, Roebuck & Co. ("Sears, Roebuck"), (2) Mr. Lampert, who served as chairman of the board of Kmart from the date of its emergence from Chapter 11 on May 6, 2003, until March 2005,[4] and (3) Mr. Day, who was Kmart's president and chief operating officer from March 2002 until January 2003 when he became its chief executive officer, serving in that capacity until October 2004.[5]

*Factual Allegations*

Before turning to the allegedly false and misleading statements, it is useful to outline plaintiffs' claim.  The following factual allegations, which are assumed true for the purpose of this motion, are drawn from the Complaint and other documents properly before the Court on the motion.[6]

*Kmart's Leases*

By the 1980s, it became increasingly attractive to many commercial entities to rent rather than buy real estate.[7]  Kmart in particular began selling and then leasing back its property,

---

[4]
> *See id.* ¶¶ 5, 17.

[5]
> *See id.* ¶ 18.

[6]
> *See infra* notes 42-45 and accompanying text.

[7]
> *See* Cpt. ¶ 28.

3

structuring the lease terms to its own advantage.[8]  In many instances, its leases established very

low, fixed rents for terms that often exceeded seventy-five years.[9]  By 2002, these leased store

locations were "extraordinarily valuable."[10]  While the lease terms generally were not publicly

available, they were accessible to senior management and members of Kmart's board through

reports generated by Kmart's real estate market strategy ("REMS") department.[11]


   *The Bankruptcy*

           As noted, Kmart and thirty-seven of its United States subsidiaries filed for

Chapter 11 bankruptcy protection in early 2002.[12]  While in bankruptcy, Kmart retained

Rockwood Gemini Advisors ("RGA") to assist the company in analyzing and evaluating its real

estate properties and Abacus Advisory & Consulting Corp., LLC ("Abacus") to assist with the

liquidation of the inventory at a number of its stores.[13]  With the assistance of its real estate

advisors, Kmart sought to auction approximately six hundred leases, of which it succeeded in

---

[8]     *See id.*

[9]     *See id.* ¶¶ 30, 33, 35.

[10]    *Id.* ¶ 3.

[11]    *See id.* ¶¶ 29, 31.

[12]    *See id.* ¶ 44.

[13]    *See* Kleinhaus Decl. Ex. 1, at 25.

4

selling sixty-seven outright and "designation rights" to fifty-six others for up to $138 million.[14]

*Investments of Messrs. Lampert and Day*

Shortly after Kmart filed for bankruptcy, Mr. Lampert, a former chairman of Kmart who no longer was affiliated with the company at the time, and the hedge fund that he managed, ESL Investments, LLC ("ESL"), began acquiring Kmart debt at distressed prices, ultimately buying about $1.8 billion in unsecured claims for an undisclosed amount.[15] By August 2002, ESL had acquired sufficient debt to seek a place on one or more of the committees involved with Kmart's bankruptcy proceeding. In September 2002, ESL was appointed to the Financial Institutions Committee ("FIC"), which acted in the bankruptcy proceeding on behalf of institutions with holdings in Kmart at that time.[16]

On January 24, 2003, Kmart filed the Plan, the disclosure statement for which contained a liquidation analysis that reported that RGA estimated that Kmart's leases could be sold for $293.2 to $461.5 million.[17] The disclosure statement further indicated that, upon Kmart's emergence from bankruptcy, its financial statements would employ fresh start

---

14

        *See id.* at 28; Ex. 3 at 7-8, 11. A purchaser of designation rights obtained the right to sell the lease, keep the sale proceeds in the event of a sale, and direct the debtors either to assign the lease to a designated buyer or reject the lease if no buyer could be found. *See id.* Ex. 1 at 28.

15

        *See* Cpt. ¶ 51.

16

        *Id.* ¶¶ 4, 52.

17

        *See* Kleinhaus Decl. Ex. 1, App. B at B-13.

accounting.[18]  Under this method, it explained, the company's "assets and liabilities [would] be stated at their reorganization value, which approximates fair value at the date of emergence from Chapter 11," and that the value of its non-current assets would be reduced on its balance sheet to account for "negative goodwill," or the difference between the fair market value of Kmart's net assets and the value ascribed to the reorganized company.[19]

At the same time, Kmart entered into a so-called investment agreement pursuant to which it (a) undertook, upon approval of the Plan and the company's emergence from Chapter 11, to issue 14 million new shares of common stock to affiliates of ESL and Third Avenue Partners ("TAP") at $10 per share,[20] and (b) granted ESL a two-year option to purchase 6.6 million new shares of common stock at $13 per share.[21]

---

[18]

*Id.* App. C at 8.  Fresh start accounting is the accounting method that a debtor adopts upon emergence from bankruptcy provided the debtor meets three criteria: (1) the debtor filed a Chapter 11 bankruptcy petition, (2) the debtor's reorganization value was less than allowed claims plus post-petition debt, and (3) preconfirmation shareholders received less than 50 percent of the voting shares of the reorganized company.  *See* James Horgan, *Reporting the Post-Restructuring Balance Sheet, It's Not Always What You Would Expect*, 21 AM. BANKR. J. 8, 8 (2002).  These criteria imply "that the company is a new entity with new owners and should be accounted for in a similar way to a purchase transaction." *Id.*  Thus, the new entity's balance sheet is reconstituted from a historical-cost basis to a new fair-market-value basis.  *See id.*  Firms that meet the above criteria must restate their assets and liabilities at their going-concern values.  *See* The American Institute of Certified Public Accountants' Statement of Position 90-7, *Financial Reporting by Entities in Reorganization Under the Bankruptcy Code* (Nov. 1999).  Under fresh start accounting, reorganization value in excess of amounts allocable to identifiable assets is carried as goodwill on a debtor's balance sheet.  *See* James M. Lukenda, *New Rules for Business Combinations, Intangibles and Goodwill Accounting*, 20 AM. BANKR. J. 20, 20 (2002).

[19]

*See* Kleinhaus Decl. Ex. 1, App. C at 8.

[20]

Cpt. ¶ 56.

[21]

*Id.* ¶ 58.

The bankruptcy court confirmed the Plan on April 23, 2003.[22]  Kmart emerged from bankruptcy days later, and Mr. Lampert became its chairman.[23]  Upon the closing of the investment agreement transactions, Mr. Lampert, through ESL, owned approximately 51.4 percent of Kmart's stock.[24]

On September 10, 2003, Mr. Day acquired options to purchase approximately 1.5 million new Kmart common shares at $10 to $20 per share.[25]  In 2005, he exercised options to purchase approximately 980,000 shares after Kmart's merger with Sears[26] and then sold those shares for $145 million, or at approximately $147 per share.[27]

The Complaint alleges that defendants undervalued Kmart's real estate assets after Kmart emerged from bankruptcy in order to conceal the fact that Mr. Lampert had obtained control of the company at a price far below fair market value and to allow Messrs. Lampert and Day to acquire additional shares of Kmart at bargain prices.[28]

*The Allegedly False and Misleading Statements*

---

[22]   *See id.* ¶ 44.

[23]   *See id.* ¶¶ 17, 44.

[24]   *Id.* ¶ 61.

[25]   *See id.* ¶ 18.

[26]   *Id.*

[27]   *Id.*

[28]   *See id.* ¶ 167.

Plaintiffs allege that defendants made false and misleading statements during the Class Period in a number of documents filed with the Securities and Exchange Commission ("SEC") in an effort to conceal the true value of Kmart's real estate portfolio.[29]  For example, in its June 16, 2003 Form 10-Q and subsequent filings, Kmart stated that its plant, property, and equipment ("PPE") was worth $4.623 billion and that it had reduced that value by $4.613 billion "to adjust assets and liabilities to fair market value ('FMV'), and reflect the write-off of Predecessor Company's equity and the application of negative goodwill to long-lived assets."[30] Thus, Kmart's balance sheet carried its adjusted net PPE at $10 million.[31]  Plaintiffs argue this and like statements misrepresented the true value of Kmart's real estate assets, which, plaintiffs allege, actually was $9 to $18 billion.[32]  They contend that this understatement resulted in the prices at which plaintiffs sold shares being lower than they would have been had the true value of Kmart's real estate assets been disclosed.[33]

*The 2004 Store Sales*

---

[29]

> *See* Kleinhaus Decl. Ex. 8 (June 16, 2003 Form 10-Q), Ex. 9 (Aug. 29, 2003 Form 10-Q), Ex. 10 (Oct. 29, 2003 Form 10-Q), Ex. 11 (Mar. 18, 2004 Form 10-K), Ex. 12 (May 17, 2004 Form 10-Q).

[30]

> *Id.* Ex. 8 at 10.

[31]

> *See id.*  Kmart made similar statements in its August 29, 2003, October 29, 2003, and May 17, 2004 Forms 10-Q and accompanying press releases, as well as in its March 18, 2004 Form 10-K.

[32]

> *See* Cpt. ¶ 7.

[33]

> *See id.* ¶ 2.

On June 4, 2004, Kmart announced that it would sell up to twenty-four of its stores to The Home Depot, Inc. ("Home Depot") for up to $365 million.  Several weeks later, it announced the sale of up to fifty-four additional stores to Sears, Roebuck for up to $621 million.[34]  Ultimately, Kmart sold eighteen stores to Home Depot for $271 million and fifty stores to Sears, Roebuck for $575.9 million.[35]  Plaintiffs allege that, as a result of these announcements, the price of Kmart common stock rose from its closing price of $54.86 per share on June 3, 2004, the day before the Home Depot announcement, to $88.06 per share on September 29, 2004, the day that Kmart announced that it had finalized the Sears, Roebuck sale.[36]

*This Action*

Almost two years later, plaintiffs commenced this action, alleging that defendants violated Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"),[37] and SEC Rule 10b-5 thereunder[38] on the theory outlined above.   They allege also that Messrs. Lampert and Day were "controlling persons" within the meaning of Section 20(a) of the Exchange Act[39] and therefore are vicariously liable for the company's allegedly fraudulent acts.

---

[34] *See id.* ¶ 71.

[35] *See id.* ¶¶ 72-73.

[36] *See id.* ¶ 2.

[37] 15 U.S.C. § 78j(b).

[38] 17 C.F.R. § 240.10b-5 (2007).

[39] 15 U.S.C. § 78g(a).

*Discussion*

I.      *Standard Governing Motions to Dismiss*

In deciding a motion to dismiss, a court ordinarily accepts as true all well-pleaded factual allegations and draws all reasonable inferences in the plaintiff's favor.[40]  In order to survive such a motion, however, "the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'"[41]  Although such motions are addressed to the face of the pleadings, the court may consider also (1) documents attached to or incorporated by reference in the complaint,[42] (2) documents "integral" to and relied upon in the complaint, even if not attached or incorporated by reference,[43] (3) public disclosure documents required by law to be, and that have been, filed with the SEC,[44] and (4) facts of which judicial notice properly may be taken under Rule 201 of

---

[40]     *See Levy v. Southbrook Int'l Invs., Ltd.*, 263 F.3d 10, 14 (2d Cir. 2001).

[41]     *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); *see also Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (declining to limit *Bell Atl. Corp.* to antitrust cases).

[42]     *See Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000) (citing *Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir. 1989)).

[43]     *See Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995); *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991).

[44]     As the Second Circuit explained in *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991):

"[I]t is highly impractical and inconsistent with Fed. R. Evid. 201 to preclude a district court from considering [SEC filings] when faced with a motion to dismiss a securities action based on allegations of material misrepresentations

the FED. R. EVID.[45]

As this is a securities fraud case, the Complaint must satisfy the heightened

pleading requirements of Rule 9(b) and the Private Securities Litigation Reform Act of 1995

("PSLRA")[46] – it must state the facts and circumstances constituting the alleged fraud with

particularity.[47]  Thus, it must "(1) specify the statements that the plaintiff contends were

fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4)

explain why the statements were fraudulent."[48]  Under the PSLRA, the Complaint must also

---

or omissions.  First, the documents are required by law to be filed with the SEC, and no serious question as to their authenticity can exist.  Second, the documents are the very documents that are alleged to contain the various misrepresentations or omissions and are relevant not to prove the truth of their contents but only to determine what the documents stated.  Third, a plaintiff whose complaint alleges that such documents are legally deficient can hardly show prejudice resulting from a court's studying of the documents.  Were courts to refrain from considering such documents, complaints that quoted only selected and misleading portions of such documents could not be dismissed under Rule 12(b)(6) even though they would be doomed to failure.  Foreclosing resort to such documents might lead to complaints filed solely to extract nuisance settlements.  Finally, we believe that under such circumstances, a district court may take judicial notice of the contents of relevant public disclosure documents required to be filed with the SEC as facts 'capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.'  Fed. R. Evid. 201(b)(2).  This of course includes related documents that bear on the adequacy of the disclosure as well as documents actually alleged to contain inadequate or misleading statements."

[45]

See *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (quoting *Brass v. Am. Film Tech., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993)); *Hirsch v. Arthur Anderson & Co.*, 72 F.3d 1085, 1092 (2d Cir. 1995).

[46]

PUB. L. NO. 104-67, 109 Stat. 737 (1995).

[47]

FED. R. CIV. P. 9(b).

[48]

*Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000) (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) (internal quotation marks omitted)).

"state with particularity facts giving rise to a strong inference" of *scienter*.[49]

In this case, plaintiffs' allegations are made on information and belief[50] as well, allegedly, as on the direct personal knowledge of three confidential witnesses ("W1," "W3," and "W4").[51]  Where an allegation is made on information and belief, "the complaint shall state with particularity all facts on which that belief is formed."[52]  Where plaintiffs rely on confidential witnesses in support of their allegations, they need not identify them by name, but they must describe each informant "with sufficient particularity to support the probability" that someone in the informant's position would possess the information alleged.[53]  With respect to allegations derived from confidential witnesses, the Court considers only those allegations that later were corroborated by those witnesses in depositions.[54]

---

[49]

15 U.S.C. § 78u-4(b)(2).

[50]

"[A]llegations based on the investigation of counsel are deemed to be made on 'information and belief.'"  *Malin v. XL Capital Ltd.*, 499 F. Supp.2d 117, 136 n.16 (D. Conn. 2007).  "[T]he phrase 'investigation of counsel' is meaningless . . . .  '[N]o amount of investigation can transform information and belief – hearsay, essentially – into personal knowledge.'"  *Id.* (quoting *In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp.2d 281, 356 n.32 (S.D.N.Y. 2003)).

[51]

By letter to Paul Vizcarrondo, Jr., Esq. dated May 6, 2008, plaintiffs admitted that W2 was "inadvertently included in the Complaint" and that "no information from [W2] was used in the filed complaint."

[52]

15 U.S.C. § 78u-4(b)(1).  The requirement of stating "all facts" is not applied literally. *See Novak*, 216 F.3d at 313-14.

[53]

*Novak*, 216 F.3d at 314.

[54]

On April 15, 2008, the late Judge Sprizzo denied defendants' motion to dismiss without prejudice based on information in the Complaint that allegedly was supplied by three confidential witnesses.  Judge Sprizzo ordered defendants to depose those confidential witnesses in order to determine whether they supported the allegations in the Complaint

II.     *The 10b-5 Claims*

The elements of a Section 10(b) – Rule 10b-5 claim are that the defendant "(1) made misstatements or omissions of material fact; (2) with *scienter*; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury."[55]

Defendants argue that the Complaint should be dismissed because it fails adequately to allege (1) an actionable misstatement or material omission, (2) that defendants acted with the requisite *scienter*, or (3) damages.

A.     *Actionable Misstatement or Material Omission*

Plaintiffs allege that defendants represented that the fair market value of Kmart's real estate was $10 million when, in reality, it was $9 to $18 billion.  This rather dramatic assertion is not borne out by plaintiffs' well pleaded factual allegations.

First, defendants never represented that the fair market value of Kmart's real estate was $10 million.  In each of the statements in question, Kmart disclosed that it had accounted for its assets as required by fresh start accounting.[56] Kmart further disclosed, however, that because the fair market value of its assets exceeded the estimated value of the reorganized

---

and whether he should have granted defendants' motion to dismiss.  The case was reassigned to the undersigned after the depositions were conducted but before Judge Sprizzo ruled.

[55]    *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005) (quoting *In re IBM Corp. Sec. Litig.*, 163 F.3d 102, 106 (2d Cir. 1998) (internal quotation marks omitted)).

[56]    *See, e.g.,* Kleinhaus Decl. Ex. 8, at 9.

13

company, the "excess" asset value – otherwise known as "negative goodwill" – would be allocated on a pro-rata basis to reduce the company's non-current assets.[57]  For example, in its June 16, 2003 Form 10-Q and subsequent filings, Kmart stated that its property, plant and equipment ("PPE") was worth $4.623 billion as of April 30, 2003, but that it had reduced that figure by $4.613 billion in order to "reflect the write-off of Predecessor Company's equity and the application of negative goodwill to long-lived assets," resulting in an adjusted net PPE of $10 million.[58]

After reading these disclosures, no rational investor reasonably could have concluded that $10 million was represented the fair market value of the company's real estate. To the contrary, any literate person would have understood that Kmart had stated that the fair market value of its PPE, as of April 30, 2003, was $4.623 billion.

To be sure, there is quite a gap between $4.623 billion and $9 billion, let alone $18 billion.  But plaintiffs fail adequately to allege that the fair market value of Kmart's real estate was materially more than $4.623 billion.  Plaintiffs' $9 billion and $18 billion figures are extrapolations from two sources:  (1) the average rent paid in 2002 for Kmart's space (the "$9 Billion Methodology"), and (2) the prices obtained in 2004 for a small fraction of Kmart's real estate interests (the "$18 Billion Methodology").  Neither extrapolation, however, supports the assertion that the fair market value of Kmart's leases, as of April 30, 2003, was $9 to $18 billion.

---

[57]     *Id*.

[58]     *Id*. at 10.

14

1.    *The $9 Billion Methodology*

Plaintiffs' $9 billion figure has its genesis in the assertion that Abacus in August 2002 prepared a document demonstrating that the majority of Kmart's leases (1) pre-dated the mid-1990s, (2) contained rent terms fixed at $2 to $4 per square foot, and (3) could be extended for terms often exceeding seventy-five years.[59]  The national average rent for similar store space was $8 to $10 per square foot.[60]  Starting from these premises, plaintiffs allege that Kmart's entire real estate portfolio, as of April 30, 2003, properly could be valued by (a) calculating the difference between Kmart's average annual store rent and the national average rent for similar store space, (b) multiplying that difference by the average size of Kmart's stores, (c) multiplying the resulting figure by fifty, which was the average term for which a Kmart lease could be extended, and then (d) multiplying that figure by the total number of Kmart stores.[61]  Accordingly, plaintiffs argue, Kmart's real estate was worth approximately $9 billion during the Class Period.  Moreover, plaintiffs allege that W3, a former executive at Kmart employed in its real estate department, "independently corroborated the use of this methodology to value Kmart's real estate."[62]

The $9 Billion Methodology is entirely too speculative to support the conclusion

---

[59]

    *See* Cpt. ¶¶ 33, 35.

[60]

    *See id.* ¶ 35.

[61]

    *See id.* ¶¶ 76-77.

[62]

    *Id.* ¶ 77.  W3 was responsible for "expanding, remodeling and disposing of Kmart's stores, and was directly involved in the decision to sell Kmart stores in the first tranche of store sales in the bankruptcy," but he did not work at Kmart during the Class Period. *Id.* ¶ 26.

that the fair market value of Kmart's real estate was materially more than $4.623 billion. First, it presupposes that Kmart's stores as a whole were comparable to the "average" store nation-wide.[63]   Second, it assumes that all of Kmart's leases could have been freely assigned and extended for an average of fifty years. But many of Kmart's leases contain "go-dark" provisions that would have permitted a landlord to terminate a lease upon Kmart's decision to discontinue operations at a particular store.[64] In short, plaintiffs' theory piles one unsubstantiated assumption on another.

2.    *The $18 Billion Methodology*

The $18 Billion Methodology is based on the prices obtained for a small fraction of Kmart's real estate interests in 2004.

On August 23, 2004, Kmart announced the final agreement for the sale of eighteen stores to Home Depot for $271 million. Several weeks later, it announced the sale of fifty stores to Sears Roebuck for $575.9 million.[65] Thus, Kmart sold sixty-eight of its 1,513 stores for $846.9 million, or an average of $12.45 million per store. Plaintiffs argue that Kmart's entire real estate portfolio could be valued by multiplying $12.45 million by the total number of Kmart

---

[63]

See Deposition of W4, dated June 2, 2008, at 65:18-66:11 (stating that "[t]here are pieces of information . . . which, beyond the square foot charges, would impact the value of the store, the location of the store, the condition of the store, the particular area the store is in, the competition in the area, the market rate . . . and any kind of lease restrictions that may prevent me from getting the value of what is being termed as an undervalued lease.").

[64]

See Kleinhaus Decl. Ex. 1, at 29.

[65]

See Cpt. ¶¶ 72-73.

16

stores, resulting in a valuation of approximately $18 billion.[66]  This assertion borders on the absurd.

First, plaintiffs nowhere assert that the sixty-eight stores sold to Home Depot and Sears – which constituted only 4.5 percent of all Kmart stores – were in any way representative of the whole.  It therefore is entirely possible that Home Depot and Sears bought the 68 most desirable locations at prices that reflected their high value and that all of the remaining stores were far less valuable.  Thus, plaintiffs' $18 Billion Methodology is tantamount to arguing that one who had two valuable Monets and five kids' finger paintings and who sold the Monets for $2 million had a collection worth $7 million – after all, the Monets sold for an average of $1 million each, so just multiply the $1 million per painting average by a total of seven paintings.

Second, the Sears and Home Depot deals were finally agreed in August and September 2004, more than a year after the date as of which the financial statements at issue were rendered.  Even if the stores sold to Sears and Home Depot were representative of all, their value a year or more later would not support a higher valuation at the earlier relevant date.

Plaintiffs cite *Rothman v. Gregor*[67] for the proposition that post-class period data can be used to confirm what a defendant knew during the class period.[68]  The Second Circuit there held that massive write-offs in royalty advances that occurred just after the close of a class period tended to support the conclusion that the assets had been overvalued during the class

---

[66]

        *See id.* ¶ 75.

[67]

        220 F.3d 81 (2d Cir. 2000).

[68]

        *See* Pl. Mem. at 22-23.

period.[69]  But *Rothman* has no bearing here because prices obtained in August and September 2004 are much more remote in time.

The Complaint thus fails sufficiently to allege facts supporting the assertion that the fair market value of Kmart's entire real estate portfolio as of April 30, 2003 was materially more than $4.623 billion during the Class Period.  Accordingly, plaintiffs have not alleged adequately circumstances indicating that any of the Class Period statements were false or misleading at the time they were made.  The Complaint therefore fails to state a legally sufficient claim.

> B.     *Defendants' Intent to Deceive*

The Complaint would be insufficient even if it sufficiently had alleged an actionable misstatement or material omission.

Plaintiffs must "state with particularity facts giving rise to a strong inference that [each] defendant acted with the required state of mind."[70]  To satisfy this requirement, a complaint must (1) demonstrate "that defendants had both motive and opportunity to commit fraud," or (2) allege "facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."[71]  A complaint gives rise to a strong inference of *scienter* "only if a reasonable person would deem the inference of *scienter* cogent and at least as compelling as

---

[69]      *See Rothman*, 220 F.3d at 92.

[70]      15 U.S.C. § 78u-4(b)(2).

[71]      *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 168-69 (2d Cir. 2000) (citing *Shields*, 25 F.3d at 1128).

any opposing inference one could draw from the facts alleged."[72]   Moreover, conclusory allegations are insufficient to establish *scienter*.   "[A] pleading technique [that] couple[s] a factual statement with a conclusory allegation of fraudulent intent is insufficient to support the inference that the defendants acted recklessly or with fraudulent intent."[73]

### 1.   *Mr. Lampert's Alleged Admissions*

Plaintiffs first argue that Mr. Lampert admitted that he knew that Kmart's real estate assets were deeply undervalued when he acquired his controlling interest in the company.[74] They cite a *Fortune* article dated February 20, 2006, which stated that in 2002, "Lampert knew exactly what he was doing . . . . [I]f need be, Lampert could sell off Kmart's real estate, which had been valued at $800 million in a liquidation analysis filed in bankruptcy court.   He was sure it was worth much more."[75]   In addition, plaintiffs cite a *Business Week* article dated April 16, 2007, which stated that Mr. Lampert in 2002, "saw that Kmart's real estate was deeply undervalued by creditors, and figured that would protect his investment."[76]

Far from "admissions," these articles merely report press speculation about Mr. Lampert's opinions years earlier.   They are insufficient to give rise to a strong inference of

---

[72]   *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).

[73]   *Rombach v. Chang*, 355 F.3d 164, 176 (2d Cir. 2004) (internal quotation marks and citation omitted).

[74]   *See* Cpt. ¶¶ 143-44.

[75]   *Id.* ¶ 143.

[76]   *Id.* ¶ 144.

*scienter.*[77]


      2.      *Motive and Opportunity to Commit Fraud*

      Plaintiffs next argue that Messrs. Lampert and Day had a motive and the opportunity to commit the fraud alleged in the Complaint.

      In alleging motive and opportunity, a plaintiff must demonstrate the presence of "concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged," as well as "the means and likely prospect of achieving concrete benefits by the means alleged."[78]  As high-level executives and directors of Kmart during the Class Period, Messrs. Lampert and Day certainly had the opportunity to commit the fraudulent acts alleged in the Complaint.  The parties dispute, however, whether Messrs. Lampert and Day had a motive to commit those acts.

      Plaintiffs claim that Mr. Lampert was motivated to conceal Kmart's true real estate value in order "to obtain control of Kmart as cheaply as possible" and to "prevent his earlier machinations [i.e. his failure to disclose the true value of Kmart's real estate] from coming to light until a reasonable period of time had passed."[79]  Plaintiffs argue that Mr. Day was motivated to conceal Kmart's true real estate value in order "to use the undervalued Kmart real

---

[77]

      *See In re Merrill Lynch & Co.*, 273 F. Supp.2d 351, 374 (S.D.N.Y. 2003); *Stern v. Leucadia Nat'l Corp.*, 844 F.2d 997, 1004 (2d Cir. 1988) ("It is not enough to quote press speculation about defendants' motives . . . . Such allegations simply do not provide . . . specific, well-pleaded facts" (internal quotation marks and citation omitted)).

[78]

      *Shields*, 25 F.3d at 1130; *see also Ganino*, 228 F.3d at 170; *Novak*, 216 F.3d at 307.

[79]

      Cpt. ¶ 146.

estate as part of Kmart's post bankruptcy strategy and achieve large profits for himself," as he acquired options to purchase approximately 1.5 million shares of new Kmart common stock at $10 to $20 per share.[80]

Even drawing all reasonable inferences in plaintiffs' favor, these allegations do not give rise to a strong inference that Mr. Lampert or Mr. Day had a motive to misrepresent Kmart's true real estate value during the Class Period. Although plaintiffs assert that Messrs. Lampert and Day were motivated to obtain additional Kmart stock at artificially low prices, all options that they exercised and shares that they acquired during the Class Period were obtained at prices fixed and pursuant to contracts made during Kmart's bankruptcy, months before the Class Period statements were made.[81] Having already negotiated these transactions at fixed prices, it defies logic and common sense to suggest that Messrs. Lampert and Day, both major investors in Kmart from the time that the company emerged from bankruptcy, subsequently would have concealed Kmart's true real estate value in order to suppress the price of the company's stock. To the contrary, their only plausible motive thereafter would have been to maximize the company's profitability and enhance its stock price by disclosing the full value of Kmart's real estate assets. Only then would their options and shares have risen in value.

---

[80]

     Pl. Mem. at 18.

[81]

     Kmart disclosed that, during its bankruptcy, it had granted ESL (of which Lampert is chairman) a two-year option to purchase new Kmart common shares at $13 per share and Mr. Day a four-year option to purchase new Kmart common shares at $10 to $20 per share. *See* Kleinhaus Decl. Ex. 8 (June 16, 2003 Form 10-Q), at 6; Kleinhaus Supp. Decl. Ex. 3 (Jan. 22, 2003 Form 8-K), Ex. 99.2; Cpt. ¶¶ 58, 155. These options are precisely those that ESL is alleged to have exercised, and Mr. Day to have acquired, during the Class Period. *See* Cpt. ¶ 167 (alleging that ESL purchased Kmart shares at $13 per share); Cpt. ¶ 18 (alleging that Mr. Day acquired 1,038,507 options to purchase Kmart shares at $10 and 519,253 options to buy Kmart shares at $20).

Plaintiffs, then, have failed to allege that Mr. Lampert or Mr. Day had a motive to misrepresent the company's true real estate value during the Class Period.[82]

>3.      *Conscious Misbehavior or Recklessness*

To raise a strong inference of *scienter* based on conscious misbehavior or recklessness, plaintiffs must allege conduct that is "highly unreasonable and which represents an extreme departure from the standards of ordinary care."[83]  In some circumstances, allegations that defendants had "knowledge of facts or access to information contradicting their public statements" may be sufficient to show recklessness.[84] Where, as here, however, a complaint fails adequately to allege motive, "the strength of circumstantial allegations of conscious misbehavior or recklessness 'must be correspondingly greater.'"[85]

In their attempt to allege conscious misbehavior or recklessness, plaintiffs rely in large part on the supposed direct personal knowledge of three confidential witnesses.  These individuals do not, however, support plaintiffs' allegation.

W1 was a real estate executive at Kmart who was "directly involved with research

---

[82]

> *See Kalnit v. Eichler*, 264 F.3d 131 (2d Cir. 2001) (stating that, in a securities fraud action, "[w]here plaintiff's view of the facts defies economic reason, . . . [it] does not yield a reasonable inference of fraudulent intent" (quoting *Shields*, 25 F.3d at 1130)).

[83]

> *Novak*, 216 F.3d at 308 (internal quotation marks and citations omitted); *see also South Cherry Street, LLC v. Hennessee Grp. LLC*, No. 07-3658-cv, slip op. at 22-25 (2d Cir. Jul. 14, 2009).

[84]

> *Novak*, 216 F.3d at 308.

[85]

> *In re Bayer AG Sec. Litig.*, No. 03-2004-CV, 2004 WL 2190357, at *43 (S.D.N.Y. Sept. 30, 2004) (quoting *Beck v. Mfrs. Hanover Trust Co.*, 820 F.2d 46, 50 (2d Cir. 1987)).

supporting the Company's decisions to purchase, sell or develop real estate,"[86] but who left Kmart prior to the Class Period.  According to W1, REMS generated reports that tracked Kmart's confidential lease terms and, implicitly, the underlying value of Kmart's real estate holdings.[87] He further stated that senior management and members of the board had "access" to REMS reports.  Plaintiffs therefore argue that Messrs. Lampert and Day knew, or should have known, that Kmart's real estate was undervalued throughout the Class Period.[88]

W3 is another former real estate executive at Kmart – he too left before the Class Period – who was responsible for "expanding, remodeling and disposing of Kmart's stores, and was directly involved in the decision to sell Kmart stores in the first tranche of store sales in the bankruptcy."[89]  According to the Complaint, he "independently corroborated the use of [the $9 Billion Methodology] to value Kmart's real estate,"[90] and confirmed that it was "well known internally" at Kmart that the company's leases were valuable.[91]  In addition, plaintiffs allege that "Lampert collected a wealth of nonpublic knowledge about the market value of Kmart's real estate" during the bankruptcy proceedings from real estate analyst Jeffrey Stollenwerk, who, according to W3, was a sophisticated investor who was "very knowledgeable regarding the value

---

[86]   Cpt. ¶ 24.

[87]   *See id.* ¶ 31.

[88]   *See id.* ¶¶ 24, 142.

[89]   *Id.* ¶ 26.

[90]   *Id.* ¶¶ 76-77.

[91]   *Id.* ¶ 35.

of real estate held by retail chains such as Kmart."[92]

W4 is an employee of Abacus, which negotiated rent reductions by reviewing store performance and requesting reductions from landlords of low performing stores.[93] According to W4, Abacus surveyed Kmart's lease terms and prepared the 2002 Abacus document, which set forth certain lease terms of four hundred stores.[94]  Plaintiffs allege that Messrs. Lampert and Day knew, or should have known, that Kmart's real estate was undervalued after reviewing the 2002 Abacus document.[95]

A reasonable person could not infer from the statements these confidential witnesses acknowledged in their depositions that Mr. Lampert or Mr. Day acted with the requisite recklessness or intent.  Two of them left the company before the Class Period and none had any contact with either Mr. Lampert or Mr. Day.

The REMS department that generated the reports upon which W1 relied was discontinued in 2001, more than two years before the start of the Class Period[96] and W1 in any case testified that "you can make no assumption on value based on the data contained in [the REMS] report."[97]  Moreover, it is questionable whether the REMS reports, which tracked certain

---

[92]

*Id.* ¶ 50.

[93]

*See id.* ¶ 27.

[94]

*See id.* ¶ 32.

[95]

*See id.* ¶ 68.

[96]

*See* deposition of W1, dated June 10, 2008, at 42:23-43:23.

[97]

Deposition of W1, dated June 10, 2008, at 17-20.

24

lease terms for individual store locations, or the 2002 Abacus document, which recorded certain lease terms for less than a third of Kmart's stores, contained enough information to value Kmart's entire real estate portfolio.

Second, the Abacus document was produced in August 2002, almost a year before the start of the Class Period.[98]

Third, the Complaint does not allege that defendants have ever valued Kmart's entire real estate portfolio at $9 billion or $18 billion based on Kmart's lease terms.  In fact, RGA relied on those very same terms to value Kmart's real estate during Kmart's bankruptcy at less than $1 billion, which the bankruptcy court found to be "persuasive, credible and accurate."[99]

Finally, the Complaint does not allege that these documents were generated or even available at any time during the Class Period.

Plaintiffs' last claim that there is a strong inference, given the significance of Kmart's real estate to the overall value of the company, that Messrs. Lampert and Day, as high-level executives and directors of Kmart, were aware of its value.[100]  This allegation, however, is general and unsupported.  But "[g]eneric and conclusory allegations based upon rumor or conjecture are undisputedly insufficient to satisfy the heightened pleading standard of 15 U.S.C. § 78u-4(b)(1)."[101]

---

[98]
    *See* Deposition of W1, dated June 10, 2008, at 42:23-43:23.

[99]
    Kleinhaus Decl. Ex. 1, App. B at B-13; Ex. 2 at 14.

[100]
    *See* Pl. Mem. at 14.

[101]
    *Malin*, 499 F. Supp.2d at 140 (holding that the plaintiffs' allegation, based on confidential witness reports, that accounting problems were "well known" to defendant's

25

In sum, plaintiffs' allegations, taken individually or considered as a whole, fail to give rise to a strong inference that Mr. Lampert or Mr. Day knowingly concealed the true value of Kmart's real estate during the Class Period. The Complaint, therefore, fails to state a legally sufficient claim.

As the Court concludes that the Complaint does not adequately allege that defendants made an actionable misstatement or material omission with *scienter*, the Court need not consider whether the Complaint adequately alleges damages or their Section 20(a) claims.


*Conclusion*

For the foregoing reasons, defendants' motion to dismiss the Complaint [docket item 40] is granted. The Clerk shall enter final judgment of dismissal.

SO ORDERED.

Dated:  July 21, 2009

---

management team was not sufficient to satisfy the pleading requirements (internal quotation marks and citations omitted)).  *See also Druskin v. Answerthink, Inc.*, 299 F. Supp.2d 1307, 1333 (S.D. Fla. 2004) (holding that the plaintiff's allegation, based on confidential witness reports, that information was "known or common knowledge within the Company" was too vague and conclusory to support a finding that the defendants knew or were severely reckless in not knowing that they were making false statements (internal quotation marks and citation omitted)).

_____
Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)